# IN THE SUPREME COURT OF CALIFORNIA

SUNFLOWER ALLIANCE,
Plaintiff and Respondent,

v.

DEPARTMENT OF CONSERVATION et al.,
Defendants;

REABOLD CALIFORNIA, LLC,
Real Party in Interest and Appellant.

S287414

First Appellate District, Division Five
A167698

Contra Costa County Superior Court
N221503

June 25, 2026

Chief Justice Guerrero authored the opinion of the Court, in which Justices Corrigan, Liu, Groban, Evans, and Chavez[*] concurred.

---

[*]  Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Justice Kruger filed a concurring opinion.

SUNFLOWER ALLIANCE v. DEPARTMENT OF CONSERVATION

S287414

Opinion of the Court by Guerrero, C. J.

This case involves the proposed conversion of a dormant well that was previously used to extract oil and gas into an active well that would be used to inject treated wastewater, the byproduct of oil and gas drilling, back into the ground. The California Department of Conservation's Geologic and Energy Management Division (CalGEM) determined that the project was exempt from the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; hereafter CEQA).[1] It relied on the Guidelines for the Implementation of CEQA (Cal. Code Regs., tit. 14, § 15000 et seq.; hereafter Guidelines) "class 1" categorical exemption for "minor alteration[s] of existing . . . facilities . . . involving negligible or no expansion of existing or former use." (Guidelines, § 15301.) We consider in this opinion the meaning of CEQA's class 1 exemption, specifically whether the term "negligible" pertains to a negligible change in use or to a change that presents a negligible risk of environmental harm.

We hold that the phrase "negligible or no expansion of existing or former use" in CEQA's class 1 exemption pertains to an expansion or change in the nature or degree of a structure or facility's use, not the risk of environmental harm caused by such

---

[1]     Further statutory references are to the Public Resources Code unless otherwise noted.

1

an expansion or change in use. (Guidelines, § 15301.) Our holding is consistent with the plain language of the class 1 exemption, which does not refer to the risk of environmental harm. It is also consistent with CEQA's statutory and regulatory scheme as a whole, which reflects the Legislature's intent to empower the Secretary (Secretary) of California's Natural Resources Agency (CNRA), rather than lead agencies or reviewing courts, to identify categories of projects that are exempt from CEQA as unlikely to cause significant environmental effects. This interpretation of the class 1 exemption also comports with CEQA's multistep environmental review process, which generally does not implicate the type of environmental review the Court of Appeal contemplated at the exemption determination stage.

Because the Court of Appeal below misinterpreted the class 1 exemption, we reverse its judgment and remand for the court to reconsider the applicability of the exemption to the proposed well conversion at issue here under the proper analytical framework. In light of our holding, it is unnecessary for us to reach the second question on which we granted review, whether an agency may claim a categorical exemption from environmental review under CEQA while also adopting project conditions relating to potential environmental effects.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Reabold California, LLC (Reabold) has a leasehold in the Brentwood Oil Field, located in Contra Costa County, where Reabold conducts oil and gas drilling activities. Reabold's leasehold, known as the Ginochio Lease, contains two active oil wells and a third inactive well, which the parties identify as the Ginochio Well. The Ginochio Well was built in 1963 and was

used to extract oil and gas until 1984, when it became inoperative and was plugged with cement.

When oil or gas is extracted from the earth, it creates a wastewater byproduct. (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, 778 (*Sunflower Alliance*).) Reabold currently disposes of the wastewater produced by its active wells by trucking it to an offsite location. Reabold estimates that its active wells produce 300 barrels (12,600 gallons) of wastewater each day, which requires heavy trucks to travel hundreds of miles per week.

As an alternative to trucking wastewater offsite, the oil and gas industry sometimes uses water injection wells, known as "Class II" wells,[2] to inject the wastewater — once it has been treated — into an underlying aquifer. (See *Sunflower Alliance*, *supra*, 105 Cal.App.5th at p. 778.) Because water injection wells have the potential to affect nearby clean water sources, they are subject to extensive state and federal regulations. (See *id.* at p. 777; § 3106, subd. (a); Cal. Code Regs., tit. 14, § 1724.5 et seq.; 40 C.F.R. § 144.6 et seq. (2026).) CalGEM must approve any new water injection well project and, as part of the review and approval process, "consult with the State Water Resources

---

[2] The term "Class II" derives from the Code of Federal Regulations. (See § 3130, subd. (b) [defining " 'Class II' well" as having the "same meaning set forth in Section 144.6 of Title 40 of the Code of Federal Regulations"]; 40 C.F.R. § 144.6(b)(1) (2026) [defining "Class II" wells as those used to inject fluids that are "brought to the surface in connection with . . . conventional oil or natural gas production and may be commingled with waste waters from gas plants which are an integral part of production operations"].) To avoid confusion with the CEQA exemption classifications, we refer to Class II wells as water injection wells going forward.

Control Board [State Water Board] or the Regional Water Quality Control Board." (Cal. Code Regs., tit. 14, § 1724.6, subd. (a).) The state and regional water boards may provide comments on, and suggest modifications to, water injection well projects to protect against possible contamination of the local usable water supply.

The Brentwood Oil Field already has two active water injection wells, although neither is located on the Ginochio Lease. In 2020, Reabold applied for a "Project Approval Letter" (see Cal. Code Regs., tit. 14, § 1724.6, subd. (a)) from CalGEM to reopen and convert the Ginochio Well into a water injection well. As required by the application process, Reabold submitted a technical report in support of the proposed project. (See Cal. Code Regs., tit. 14, § 1724.7, subd. (a) [requiring injection well applications to be supported by data demonstrating that "injected fluid will be confined to the approved injection zone and that the underground injection project will not cause damage to life, health, property, or natural resources"].)

The technical report explained that, if the project was approved, approximately 10,950,000 barrels (459,900,000 gallons) of treated wastewater would be injected into the Ginochio Well over a period of 20 years and deposited into an underlying "exempted aquifer" determined to have no "beneficial use." (See § 3130, subd. (c) [defining " '[e]xempted aquifer' "].) In addition, the technical report provided assurances that the injected wastewater would be confined "both vertically and horizontally in the study area."

Despite these assurances, CalGEM, the State Water Board, and the Central Valley Regional Water Quality Control Board (Regional Water Board) initially expressed concerns

about the project. CalGEM noted that the proposed injection well was not properly isolated by cement from a nearby basin of fresh water and an underground source of drinking water (USDW) and proposed that it would condition approval of the project on measures to "isolat[e] these zones." CalGEM also noted the presence of a fault line in the area, which it believed was "non-sealing" and thus could act as a conduit for injected wastewater. CalGEM requested further "discussion supported with data detailing how fluids would be prevented from migrating upwards through the non-sealing fault into USDW[s] above."

The water boards also voiced concerns about migration of the injected wastewater into clean water sources. In its initial review, the Regional Water Board observed that if "the estimated reservoir pressure is great enough to cause fluids to migrate vertically," the nearby fault line, as well as two other abandoned wells, could potentially act as conduits from the injection site to an overlaying clean water aquifer. Additionally, the State Water Board noted the presence of "22 [active] water wells located in the study area" that "withdraw from several overlying aquifers used for domestic, agriculture, and public supply purposes." The State Water Board requested that CalGEM provide confirmation that fluids would be confined within the injection zone and noted that "[a]djustments to any aquifer parameter will affect the [area of review[3]] radius and

---

[3]     "Area of Review" means either the "zone of endangering influence" or a certain fixed radius. (40 C.F.R. § 146.6 (2026).) The "zone of endangering influence," in turn, refers to the area in which an injection well, based on different measurements, may "cause the migration of the injection and/or formation fluid

may impact other area wells and change the distance to the aquifer exemption boundary."

In response to these concerns, Reabold provided a revised technical report to CalGEM and the water boards, in which Reabold represented that it had conducted pressure testing at three distances from the Ginochio Well demonstrating the nearby fault was sealing. CalGEM agreed with Reabold's interpretation of the pressure testing data and represented to the water boards that "all wellbores within a quarter mile of the proposed injection well," including the two abandoned wells that had been identified earlier, "were found to meet zonal isolation requirements." However, the Regional Water Board, noting the pressure calculations had been based on estimates, remained concerned that "actual reservoir pressure may be great enough to cause fluids to migrate vertically into the overlying USDW, and that the [area of review/zone of endangering influence] calculations may not be representative of proposed injection activities." The board was also concerned that injection activities could "reactivate" the fault line.

To address these remaining concerns, CalGEM submitted to the Regional Water Board a revised draft project approval letter, which would impose several conditions on the project. Under the terms of the revised letter, pressure fall off testing was required prior to injection to determine the reservoir pressure, permeability, and the potential for any conduits. The revised letter further required Reabold to report its testing results to CalGEM and mandated that a "new Zone of Endangering Influence shall be calculated if the values for

_____

into an underground source of drinking water." (40 C.F.R. § 146.6(a)(1)(i) (2026).)

pressure and or permeability obtained from the test results are greater than the estimated values." "Based on the information . . . and conditions" included in CalGEM's revised project approval letter, the Regional Water Board concluded its concerns had "been resolved" and that it had "no objection to the proposed Project." CalGEM subsequently issued its final project approval letter, containing the conditions outlined above.

Along with its project approval, CalGEM issued a notice of exemption (NOE), in which CalGEM described the project as "allow[ing] disposal of [wastewater] into a Class II Water Disposal well proposed to be installed in an existing well boring" that was "currently listed as plugged and abandoned." CalGEM determined that the "project is categorically exempt from CEQA under the 'Class 1' [citation] exemption per the CEQA Guidelines and CalGEM's regulations [citation] because the project proposes minor alteration of an existing previously permitted well involving a negligible expansion of former use." CalGEM further determined that no exceptions to the class 1 exemption applied, as there was "no substantial evidence that there are any 'unusual circumstances' associated with the proposed project that create a reasonable possibility that the activity will have a significant effect on the environment or that significant 'cumulative impacts' would result." (See Guidelines, § 15300.2, subds. (b), (c).) In support of this determination, CalGEM noted that the project would "eliminat[e] the need for routine trucking of water from the lease and restor[e] reservoir pressure that resulted from historic production." CalGEM wrote that another "important consideration is that processed wastewater is returned to the geologic zone from which it originated, cleaner than when it was removed, but still not a drinkable source."

Sunflower Alliance (Sunflower) challenged CalGEM's CEQA determination in superior court by petition for writ of mandate. Sunflower contended that the evidence did not support CalGEM's class 1 exemption determination, arguing the "expansion of use of the [Ginochio] Well from one that has been plugged, abandoned, and nonoperational as a 'Dry Gas' well for some undisclosed period of time to one into which approximately 300 barrels of oil production wastewater per day will be disposed does not constitute 'negligible or no expansion of former use.'" (See Guidelines, § 15301.) The court agreed with Sunflower that "injecting water is a significantly different use than pumping oil and gas" and issued a peremptory writ of mandate directing that CalGEM set aside the NOE. CalGEM filed a return stating it would submit to the writ of mandate. Reabold appealed.

The Court of Appeal reversed, concluding that "any expansion of the well's use is negligible because, under the facts here, the environmental risks of injecting the water are negligible." (*Sunflower Alliance*, *supra*, 105 Cal.App.5th at p. 777.) The court reasoned that it could not "construe 'negligible' to mean that *any* new use, or change in use," would disqualify a project from the class 1 exemption. (*Id.* at p. 784.) Rather, the analysis should focus "on the *consequences* of a change in use," consistent with CEQA's broad aim to protect the environment. (*Sunflower Alliance*, at p. 784, italics added.) The court explained, "No purpose is served by myopically focusing on whether a use is new, thereby excluding from the exemption many projects that would cause no environmental harm — precisely the type of borderline projects for which categorical exemptions are useful." (*Id.* at p. 785.) The court credited the regulatory agencies' determination that "the injected water

cannot escape the aquifer and harm people, property, or the environment" and the "environmental risks of the [well] conversion [were] negligible." (*Id.* at pp. 786, 787.) As such, the court held the project "fit[] within the class 1 exemption." (*Id.* at p. 787.) The court then rejected Sunflower's additional argument, raised on appeal, that CalGEM improperly based its exemption determination on project conditions that should have been considered as mitigation measures in a full scope environmental review. (*Id.* at pp. 787, 789.)

We granted Sunflower's petition for review.

## II. DISCUSSION

"CEQA sets out the applicable standard of review: 'In any action or proceeding . . . to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with [CEQA], the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence.' " (*City of San Diego v. Board of Trustees of California State University* (2015) 61 Cal.4th 945, 956, quoting § 21168.5.)

In this case, the trial court found that substantial evidence did not support CalGEM's determination that the proposed well conversion fell within the class 1 exemption because "it was 'not convinced that changing an oil and gas well into a water injection well involves negligible or no expansion of use.' " (*Sunflower Alliance, supra*, 105 Cal.App.5th at p. 780.) The Court of Appeal reversed based on its interpretation of the class 1 exemption as encompassing projects where a change in use has only a negligible risk of environmental harm. (*Id.* at

pp. 784, 790.) We granted review to determine the correct interpretation of the class 1 exemption. This issue " 'involves [a] pure question[] of law' " subject to de novo review. (*Protecting Our Water & Environmental Resources v. County of Stanislaus* (2020) 10 Cal.5th 479, 495.)

## A. CEQA: General Principles

" 'CEQA was enacted to advance four related purposes: to (1) inform the government and public about a proposed activity's potential environmental impacts; (2) identify ways to reduce, or avoid, environmental damage; (3) prevent environmental damage by requiring project changes via alternatives or mitigation measures when feasible; and (4) disclose to the public the rationale for governmental approval of a project that may significantly impact the environment.' " (*Union of Medical Marijuana Patients, Inc. v. City of San Diego* (2019) 7 Cal.5th 1171, 1184–1185 (*Union Medical*).) As an overriding principle, " 'CEQA embodies a central state policy to require state and local governmental entities to perform their duties "so that major consideration is given to preventing environmental damage." ' " (*Id.* at p. 1185.)

To meet these objectives, CEQA prescribes detailed procedures for governmental decisions relating to projects that may have significant environmental impacts. " 'CEQA review is undertaken by a lead agency, defined as "the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." ' [Citation.] A putative lead agency's implementation of CEQA proceeds by way of a multistep decision tree, which has been characterized as having three tiers. [Citation.] First, the agency must determine whether the

proposed activity is subject to CEQA at all. Second, assuming CEQA is found to apply, the agency must decide whether the activity qualifies for one of the many exemptions that excuse otherwise covered activities from CEQA's environmental review. Finally, assuming no applicable exemption, the agency must undertake environmental review of the activity, the third tier." (*Union Medical*, *supra*, 7 Cal.5th at p. 1185.)

At the first step, the lead agency determines whether a proposed activity qualifies as a project triggering CEQA review in the first instance. CEQA defines a " '[p]roject' " as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment," and which is funded, undertaken, or approved by a public agency. (§ 21065; see also *Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 381–382 (*Muzzy Ranch*).) A "project," however, generally does not include governmental actions having no physical impacts on the environment, such as legislative or administrative activities. (See Guidelines, § 15378, subd. (b) [delineating what a "[p]roject does not include"].) If a lead agency determines a proposed activity does not meet the definition of a project, "the agency may proceed without further regard to CEQA." (*Union Medical*, *supra*, 7 Cal.5th at p. 1186, citing Guidelines, § 15060, subd. (c)(3) [if an activity "is not a project as defined" by the Guidelines, CEQA does not apply].)

If a proposed activity qualifies as a project, the lead agency must proceed to the second step of the CEQA decision tree. In this step, the lead agency must determine whether the project is exempt from CEQA "under either a statutory exemption [citation] or a categorical exemption set forth in the CEQA Guidelines." (*California Building Industry Assn. v. Bay Area*

*Air Quality Management Dist.* (2015) 62 Cal.4th 369, 382 (*Building Industry*).) "The statutory exemptions, created by the Legislature, are found in section 21080, subdivision (b). . . . The categorical exemptions, found in Guidelines sections 15300 through 15333, were promulgated by the Secretary for the [CNRA] in response to the Legislature's directive to develop 'a list of classes of projects that have been determined not to have a significant effect on the environment.' " (*Union Medical*, *supra*, 7 Cal.5th at p. 1186.) "If a public agency properly finds that a project is exempt from CEQA," either under a statutory exemption or one of the categorical exemptions set forth in the Guidelines, "no further environmental review is necessary." (*Muzzy Ranch*, *supra*, 41 Cal.4th at p. 380.) At that point, the agency has the option of filing an NOE, which cites to the applicable statutory or categorical exemption (Guidelines, § 15062, subd. (a)(3)), supported by a "brief statement of reasons to support the finding [of exemption]." (*Id.*, subd. (a)(4).)

However, there are some *exceptions* to the exemptions, carved out by the Secretary, under which a project that might otherwise fall within a categorical exemption must nonetheless proceed with CEQA review. (See Guidelines, § 15300.2 [listing exceptions to categorical exemptions].) For example, focusing on the two exceptions mentioned in the NOE at issue here, certain exemptions are "inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant" (Guidelines, § 15300.2, subd. (b)); and "[a] categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." (Guidelines, § 15300.2, subd. (c).)

If no exemption applies or there is an exception to the applicable exemption, the lead agency proceeds to the third and final step, which is to perform an environmental review. At this stage, "the agency must first undertake an initial study to determine whether the project 'may have a significant effect on the environment.' [Citations.] If the initial study finds no substantial evidence that the project may have a significant environmental effect, the lead agency must prepare a negative declaration, and environmental review ends. [Citations.] If the initial study identifies potentially significant environmental effects but (1) those effects can be fully mitigated by changes in the project and (2) the project applicant agrees to incorporate those changes, the agency must prepare a *mitigated* negative declaration. This too ends CEQA review. [Citations.] Finally, if the initial study finds substantial evidence that the project may have a significant environmental impact and a mitigated negative declaration is inappropriate, the lead agency must prepare and certify" an environmental impact report (EIR) "before approving or proceeding with the project." (*Union Medical, supra*, 7 Cal.5th at pp. 1186–1187; see also § 21080, subds. (c)–(d).)

We have previously recognized that the core motivating principle behind CEQA is to protect our state's environmental resources. "In enacting CEQA, the Legislature declared its intention that all public agencies responsible for regulating activities affecting the environment give prime consideration to preventing environmental damage when carrying out their duties." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 (*Mountain Lion*); see *Tomlinson v. County of Alameda* (2012) 54 Cal.4th 281, 285 [CEQA and its implementing regulations "embody California's strong public

policy of protecting the environment"]; § 21001, subd. (d) [declaring the legislative intent that "the long-term protection of the environment, consistent with the provision of a decent home and suitable living environment for every Californian, shall be the guiding criterion in public decisions"].) In furtherance of these goals, we have held that "CEQA is to be interpreted 'to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Mountain Lion*, at p. 112.) Categorical exemptions must be interpreted with these broad aims in mind and are therefore "not to be expanded beyond the reasonable scope of their statutory language." (*Id*. at p. 125.)

In this case, no party disputes that the proposed well conversion qualifies as a " '[p]roject' " under CEQA. (§ 21065.) This case centers on CEQA's second step, specifically, CalGEM's determination that the proposed well conversion fell within CEQA's class 1 exemption for minor alterations to existing facilities. (Guidelines, § 15301.) The class 1 exemption "consists of the operation, repair, maintenance, permitting, leasing, licensing, or minor alteration of existing public or private structures, facilities, mechanical equipment, or topographical features, involving negligible or no expansion of existing or former use. . . . The key consideration is whether the project involves negligible or no expansion of use." (*Ibid*.) The parties offer different interpretations of this exemption. Sunflower contends that the exemption covers only existing or former uses, not any new use. Sunflower further contends that, even if a new use may qualify as an "expansion" of an existing or former use, application of the class 1 exemption turns on whether the expansion of use is itself negligible. Reabold, adopting the Court of Appeal's view, argues that the scope of the

proposed expansion in use is not determinative; rather, the exemption applies whenever the proposed expansion would pose only a negligible additional risk of environmental harm.

We hold that the class 1 exemption may apply to new uses of an existing facility that involve "negligible or no expansion" of an existing or former use (Guidelines, § 15301), but that an agency should examine the nature and scope of the proposed expansion of use, rather than its potential environmental effects, in making its exemption determination.

## B. The Plain Text of CEQA's Class 1 Exemption Requires Consideration of the Nature and Scope of a Proposed Expansion of Use, Not the Consequential Risk of Environmental Harm

CEQA and its Guidelines are subject to the same general statutory interpretation principles. (See *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1097 (*Berkeley Hillside*) ["Generally, the rules that govern interpretation of statutes also govern interpretation of administrative regulations"].) Our core task is " 'to adopt the construction that best gives effect to the Legislature's intended purpose.' [Citation.] In determining that intended purpose, we follow '[s]ettled principles.' [Citation.] 'We consider first the words of a statute, as the most reliable indicator of legislative intent.' " (*Union Medical*, *supra*, 7 Cal.5th at pp. 1183–1184.) We therefore begin by analyzing the plain text of the class 1 exemption, "giving effect to its usual meaning and avoiding interpretations that render any language surplusage." (*Berkeley Hillside*, at p. 1097.) In performing this analysis, we do not view the text of the exemption in isolation, but rather, consider it " ' "in the context of the statutory framework as a

15

whole" ' in order to harmonize CEQA's ' "various parts." ' " (*Id.* at p. 1100.)

The plain text of the class 1 exemption first requires that the proposed project be limited to "the operation, repair, maintenance, permitting, leasing, licensing, or *minor alteration* of *existing* public or private structures, facilities, mechanical equipment, or topographical features." (Guidelines, § 15301, italics added.) Reabold asserts that the proposed well conversion meets this requirement, as the project would require only minor physical alterations to the existing Ginochio Well, and Sunflower apparently conceded this point below. (See *Sunflower Alliance*, *supra*, 105 Cal.App.5th at p. 786.)

However, the class 1 exemption does not reach all projects that might qualify as minor alterations to existing facilities. Rather, it is expressly limited to projects within that category "involving negligible or no expansion of existing or former use." (Guidelines, § 15301.) The class 1 exemption also sets forth a non-exhaustive list of examples of such projects. (See *id.*, subds. (a)–(p).) In a preamble to this list, the class 1 exemption reiterates, the "key consideration is whether the project involves negligible or no expansion of use." (Guidelines, § 15301.) We must take this choice of words at face value, unless doing so would lead to absurd results. (See *Los Angeles Unified School Dist. v. Superior Court* (2023) 14 Cal.5th 758, 767, 768 [acknowledging the "well-established" principle that if " ' " ' "the [statutory] language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend" ' " ' "].) Here, neither party disputes that the phrase "negligible or no expansion" in the class 1 exemption modifies the phrase

16

"existing or former use." (Guidelines, § 15301.) However, the parties have different interpretations of its import.

Sunflower contends the word "expansion" excludes *new* uses from the scope of the class 1 exemption. In Sunflower's view, the word "expansion" can only mean an increase in degree of an existing or former use. Sunflower points to a dictionary definition of "expansion" as "the act or process of expanding"; "expand," in turn, is defined to mean "to increase the extent, number, volume, or scope of." (Merriam-Webster Dict. Online (2026) <https://www.merriam-webster.com/dictionary/expansion> [as of June 25, 2026]; *id.* at <https://www.merriam-webster.com/dictionary/expand> [as of June 25, 2026]; all Internet citations in this opinion are archived by year, docket number and case name at <http://courts.ca.gov/opinions/cited-supreme-court-opinions>.) Even assuming the exemption reaches new uses, Sunflower argues, the exemption should only apply where a change in use is itself negligible without regard to potential environmental effects.

Reabold, adopting the Court of Appeal's interpretation, argues that an expansion in use can encompass new uses, and an expansion in use is negligible for purposes of the class 1 exemption so long as its expected environmental effects are negligible. While Reabold does not contend that the class 1 exemption expressly refers to environmental risks, it characterizes this reading of the exemption as consistent with CEQA's overarching purpose of protecting the environment. In Reabold's view, "the entire point of categorical exemptions is to carve out projects" that do not have significant effects on the environment, and the "class 1 exemption cannot be divorced from that foundation."

CNRA and CalGEM (collectively, the agencies), appearing here as amici curiae, argue that neither party's interpretation comports with class 1's plain text. The agencies assert that Sunflower's preferred interpretation is overly rigid, as the cited dictionary definition of "expand" includes increases in *scope*, which would reach changes in use. (See Guidelines, § 15301.) At the same time, the agencies assert the Court of Appeal and Reabold's interpretation "is not solidly grounded in [the class 1 exemption's plain] text" because the "terms 'negligible environmental harm' or 'negligible environmental risk' (or their equivalents) do not appear anywhere" in the exemption. Instead, the agencies argue, projects that "involve 'negligible' 'expansion[s]' of 'use' can qualify for the [class 1] exemption, while projects that involve more substantial 'expansion[s]' of an existing facility's 'use' cannot."[4]

We conclude that the agencies' interpretation of the class 1 exemption is closest to the mark. Even putting aside any deference that may be owed to CNRA as the agency empowered to promulgate the Guidelines,[5] the agencies' interpretation is

---

[4] While the agencies assert the Court of Appeal's interpretation of the class 1 exemption language was misguided, they nonetheless argue the court reached the right result because substantial evidence supports CalGEM's determination that the proposed well conversion constituted a negligible change in use. We declined to include this issue in the scope of our review and therefore express no opinion on the merits of the agencies' argument. The Court of Appeal may address it on remand.

[5] See, e.g., *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12 (deference may be owed to authoring agency in interpreting its own regulations); *Building Industry, supra,* 62 Cal.4th at p. 390 (affording interpretative

the most consistent with the class 1 exemption's plain text and CEQA's overall statutory and regulatory scheme.

It is clear from the wording of the class 1 exemption that it is concerned with negligible "expansion[s] of . . . use," and that "use" refers to the "existing or former" use of the existing structures or facilities implicated in the project at issue. (Guidelines, § 15301.) While "expansion" is not defined anywhere in the Guidelines, the agencies' interpretation of expansion is the most natural and commonsense reading of the term. Expansions are commonly understood to include changes or additions. This interpretation is further supported by the examples of covered projects included in the class 1 exemption itself, several of which appear to involve a change in the use of an existing structure or facility, including (1) alterations to "[e]xisting highways and streets," such as "the addition of . . . bicycle lanes . . . that do not create additional automobile lanes" (Guidelines, § 15301, subd. (c)); (2) the "[c]onversion of a single family residence to office use" (*id.*, subd. (n)); and (3) the "[u]se of a single-family residence as a small family day care home" (*id.*, subd. (p)). These examples seem to contemplate a change, not just in degree, but in the nature of the use, including additional uses. We must interpret the word "expansion" in this context. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1100.)

At the same time, contrary to Reabold's view, the class 1 exemption does not extend to any change in use provided the change results in "negligible or no expansion" in the risk of environmental harm. (Guidelines, § 15301.) The class 1

deference to CNRA due to "its long-standing statutory role as the agency with primary responsibility for statewide implementation of CEQA").

exemption does not mention the risk of environmental harm at all, and we must not read into the regulation words it does not contain. " ' "Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." ' " (*Ennabe v. Manosa* (2014) 58 Cal.4th 697, 719 (*Ennabe*).) To do so would violate the "cardinal rule of statutory construction that courts must not add provisions to statutes." (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998.) Rather, consistent with its plain text, the class 1 exemption applies only when an expansion of use is itself "negligible." (Guidelines, § 15301.)

We are not at liberty to expand or contract the scope of the class 1 exemption beyond these plain terms. (*Mountain Lion*, *supra*, 16 Cal.4th at pp. 116, 125.) The Legislature has made clear that risk of environmental harm is properly considered by the Secretary in adopting regulations that designate classes of projects as categorically exempt, not by agencies or reviewing courts in deciding whether a particular project falls under an exemption. As we have previously explained, CEQA "establishes a comprehensive scheme to provide long-term protection to the environment. It prescribes review procedures a public agency must follow before approving or carrying out certain projects. For policy reasons, the Legislature has expressly exempted several categories of projects from review under CEQA. [Citation.] By statute, the Legislature has also directed the Secretary . . . to establish 'a list of classes of projects that have been determined not to have a significant effect on the environment and that shall be exempt from' CEQA." (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1092, citing § 21084, subd. (a).) The Secretary, accordingly, has adopted the categorical

exemptions set forth in the Guidelines sections 15301 through 15333. The exemptions constitute projects the Secretary "has found," categorically, "do not have a significant effect on the environment." (Guidelines, § 15300.)

We have emphasized that, in directing the Secretary to adopt categorical exemptions, the Legislature has evinced an intent to require the Secretary to "apply their expertise" in identifying categories of projects that will not have a significant effect on the environment. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1101.) This does not mean that projects falling within the categorical exemptions never have the potential to affect the environment. Rather, "[i]n listing a class of projects as exempt, the *Secretary* has determined that the environmental changes *typically* associated with projects in that class are not significant effects within the meaning of CEQA." (*Id*. at p. 1104, italics added.)

Here, the Secretary has determined that class 1 projects, defined to include projects involving minor alterations to existing facilities resulting in either no or only a negligible expansion in the *use* of the facility, will typically not have a significant effect on the environment and are therefore exempted from a comprehensive environmental review. If we were to interpret the exemption to apply, notwithstanding its plain terms, whenever a lead agency or reviewing court determines an expansion in use will not result in significant environmental effects, we would be bypassing the category the Secretary has defined in favor of the overarching standard the Secretary was tasked with implementing. Such a holding would usurp the Secretary's role in defining the exemption categories and change the meaning of the category identified by the Secretary. The Secretary's adoption of a regulation designating

a category of activities as exempt reflects a determination, made through a public process, that the activities described in the exemption categorically do not have a significant effect on the environment. Such regulations are entitled to deference based on the agency's expertise and because of the procedural safeguards involved in their adoption. (*Building Industry*, *supra*, 62 Cal.4th at pp. 389–390.) The court's role is not to second-guess the Legislature's wisdom in directing the Secretary to adopt categorical exemptions or the Secretary's expertise in identifying categories of projects that are unlikely to have significant environmental effects. (See *Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1108 ["This court does not sit in review of the Legislature's wisdom in balancing [the] policies [behind adopting exemptions] against the goal of environmental protection"].) Instead, the court's role is to determine whether, based on the administrative record of a challenged CEQA project, substantial evidence supports the application of the exemptions adopted by the Secretary, and in doing so, to interpret the exemptions narrowly " 'to afford the fullest possible protection to the environment.' " (*Mountain Lion*, *supra*, 16 Cal.4th at p. 112.)

The interpretation of the class 1 exemption as turning on the scope of an expansion or change in use rather than environmental effects is also generally consistent with the three step analysis we have long recognized and applied to CEQA challenges. As explained above, when an activity qualifies as a project at the first step, we proceed to CEQA's second step — determining whether the project is nonetheless exempt from CEQA, either by statute or as falling within a categorical exemption set forth in the Guidelines. If a project does not fall within an exemption, or an exception to a categorical exemption

applies, we proceed to CEQA's third step, which is to perform a full environmental review culminating in a negative declaration, a mitigated negative declaration, or, where necessary, an EIR. (§ 21080, subds. (c)–(d).) It is at this third and final step where a lead agency must determine whether there is "substantial evidence" that a project "may have . . . significant effect[s] on the environment," and if so, whether and to what extent those effects may be mitigated. (§ 21080, subds. (c), (d).)

Interpreting the class 1 exemption as extending to minor alterations to existing facilities having no or only a negligible risk of environmental harm risks conflating CEQA's second and third steps by requiring the lead agency to analyze environmental effects prematurely — without the full benefit of public participation and other procedural safeguards that a comprehensive environmental review normally entails. For nonexempt projects, depending on what the initial study reveals, the lead agency might adopt a negative declaration or mitigated negative declaration (see § 21080, subd. (c)), but only after public notice and comment. (§ 21092; Guidelines, §§ 15072, 15073, 15074, subds. (a)–(b).) Any mitigating measures that are imposed are then subject to continued reporting and monitoring requirements. (Guidelines, § 15074, subd. (d).) If an EIR is required, it likewise requires extensive public input and review. As we have explained, "The purpose of the EIR is 'to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citation.] The EIR thus works to 'inform the public and its responsible officials of

the environmental consequences of their decisions *before* they are made,' thereby protecting ' "not only the environment but also informed self-government." ' " (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944.) An exemption determination, however, is not ordinarily subject to this same level of public scrutiny.

Notwithstanding this general framework, there are other categorical exemptions — not relevant here — that appear to involve at least a surface level consideration of environmental effects at the exemption determination stage. (See, e.g., Guidelines, § 15306 [exempting information collection activities "which do not result in a serious or major disturbance to an environmental resource"].) However, in contrast to the Court of Appeal, we do not believe this circumstance fundamentally alters the analysis. (Cf. *Sunflower Alliance*, *supra*, 105 Cal.App.5th at pp. 785–786, fn. 4.) The fact that other CEQA exemptions require some consideration of possible environmental effects does not alter the general rule that substantive environmental impact analysis occurs at CEQA's third stage, after a determination has been made that a project is not exempt. Moreover, the fact that the possibility of environmental effects is expressly included as a factor in other exemptions, but is not mentioned in the class 1 exemption, indicates the Secretary did not intend for environmental effects to be the focal point in determining whether the latter applies in the first instance. (See *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1117 ["Where different words or phrases are used in the same connection in different parts of a statute, it is presumed the Legislature intended a different meaning"].)

In sum, based on the plain meaning and context of the class 1 exemption, the phrase "negligible or no expansion of existing or former use" refers to the change in the nature or degree of a structure or facility's use, not the risk of environmental harm caused by such a change in use. (Guidelines, § 15301.)[6]

## C. Reabold's Counterarguments Are Unavailing

Reabold asserts three main arguments in support of its contention that we should interpret the class 1 exemption to encompass any expansion of use so long as the risk of environmental harm is negligible or nonexistent. They are unpersuasive.

First, as alluded to above, Reabold argues that the class 1 exemption must be interpreted with its greater purpose in mind. According to Reabold, the "entire point of [CEQA's] categorical exemptions is to carve out" those projects the Secretary has determined will not have a significant effect on the environment, and the class 1 exemption must not be read "unmoor[ed]" from this purpose. As such, Reabold contends, a change in a structure or facility's use will only bring a project outside the scope of the class 1 exemption if the *consequence* of the change in use is a nonnegligible increase in the risk of environmental harm.

_____

[6] Because we find the plain text unambiguous in this regard, we further conclude it is not necessary for us to examine extrinsic resources, such as the regulatory history of the class 1 exemption. (*Ennabe, supra*, 58 Cal.4th at p. 713 [" ' "If the language of the statute is not ambiguous, the plain meaning controls and resort to extrinsic sources to determine the Legislature's intent is unnecessary" ' "].)

The problem with this argument is that the Legislature has empowered the Secretary to determine what categories of projects are unlikely to result in significant environmental effects, and the Secretary has specifically defined the class 1 exemption as including only those projects involving a negligible change in *use*. Interpreting the exemption to include projects involving any change in use, so long as the project does not involve an increased risk of environmental harm, would expand the exemption beyond its plain terms and put the lead agency in the position of determining for itself which projects should be exempt based on their perceived environmental effects. In addition, as Reabold acknowledges, "[t]he apparent rationale" of the class 1 exemption "is that the environmental effects of the operation of" an existing structure or facility "must already have been considered" and therefore further, in-depth environmental review is unnecessary. (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1195 (*Azusa*).) Reabold fails to explain how this rationale is served by a standard that focuses on the project's *prospective* environmental effects, rather than a standard that presumes such effects have been previously analyzed and considered.

Second, Reabold contends that some examples of class 1 exempted projects, i.e., the incorporation of bicycle lanes into an existing street (Guidelines, § 15301, subd. (c)), the home office conversion (*id.*, subd. (n)), or the use of a home as a day care center (*id.*, subd. (p)), involve what in Reabold's view constitute nonnegligible changes in use but little or no risk of environmental harm. As such, Reabold urges, the class 1 exemption must be — at bottom — concerned with the environmental consequences of changes in use.

Reabold once again fails to persuade. These examples of class 1 exempted projects can all reasonably be interpreted to encompass negligible expansions of existing use, as required by the class 1 exemption, without regard to their environmental effects. Bicycles already use existing traffic lanes, so the incorporation of bicycle lanes into an existing street does not substantially expand their use. A single-family residence houses a number of people who conduct activities there and come and go freely. The conversion of a single-family residence to an office does not meaningfully expand this use. Similarly, a single-family residence commonly houses a family with children, so utilizing such a space for a small family day care center is not a substantial expansion in use. Such an interpretation is generally consistent with case law applying the class 1 exemption, which focuses on material changes in a structure or facility's functionality. (Compare *Westside Los Angeles Neighbors Network v. City of Los Angeles* (2024) 104 Cal.App.5th 223, 241 ["streetscape" upgrades that did not expand the right-of-way fell within the class 1 exemption], *San Diegans for Open Government v. City of San Diego* (2018) 31 Cal.App.5th 349, 371 [upgrades to existing indoor pool facility fell within class 1 exemption], and *Erven v. Board of Supervisors* (1975) 53 Cal.App.3d 1004, 1014 [repair and maintenance of existing roads fell within the class 1 exemption, but a project to widen roads would not have] with *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 967 [modification of an existing hydroelectric project to permit consumptive use of an additional 17,000 acre feet of water, where the project previously only produced hydroelectric power, did not fall within the class 1 exemption, as a "project that shifts from nonconsumptive to

27

consumptive use is not a negligible expansion of current use" but "a major change in focus"].) Moreover, by focusing on the fact that class 1 examples involve a low risk of environmental harm, Reabold mistakes a necessary condition for a sufficient one. All exempt projects would generally be expected to have a low risk of such harm. Thus, while the low risk of environmental harm may be common to all exempt projects, it does not suffice to distinguish them from nonexempt projects. The language of the exemptions — which reflect considered decisions by the Secretary that the specified types of projects categorically do not have significant impacts on the environment — is what distinguishes exempt from nonexempt projects.

Finally, echoing the Court of Appeal, Reabold argues that it is not inconsistent with CEQA to consider environmental effects at the exemption determination stage. (See *Sunflower Alliance, supra,* 105 Cal.App.5th at pp. 784, 785–786, fn. 4.) In fact, Reabold argues, "CEQA *requires* such an analysis, because evidence of significant environmental impacts related to unusual circumstances may trigger the unusual circumstances exception to a categorical exemption."

It is true that some consideration of environmental effects comes into play when considering the unusual circumstances exception to a categorical exemption. Beyond that general point, however, we disagree with Reabold's understanding of how the unusual circumstances exception functions within CEQA's overall framework.

A party challenging application of a categorical exemption has the burden of producing evidence supporting the claimed exception to that exemption. (*Berkeley Hillside, supra,* 60 Cal.4th at p. 1105.) "[T]o establish the unusual

circumstances exception, it is not enough for a challenger merely to provide substantial evidence that the project *may* have a significant effect on the environment, because that is the inquiry CEQA requires absent an exemption. (§ 21151.) Such a showing is inadequate to overcome the Secretary's determination [in promulgating the Guidelines] that the typical effects of a project within an exempt class are not significant for CEQA purposes. On the other hand, evidence that the project *will* have a significant effect *does* tend to prove that some circumstance of the project is unusual. An agency presented with such evidence must determine, based on the entire record before it — including contrary evidence regarding significant environmental effects — whether there is an unusual circumstance that justifies removing the project from the exempt class." (*Ibid.*)

We therefore have interpreted the unusual circumstances exception as involving a two-part inquiry. (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1115.) First, the lead agency must determine whether a project involves "unusual circumstances," which is a factual question. (*Id.* at p. 1114.) If so, the lead agency must then determine whether there is a "fair argument" the project may have a significant effect on the environment due to those unusual circumstances. (*Id.* at p. 1115.) Thus, the unusual circumstances exception will apply only if findings of "*both* unusual circumstances *and* a potentially significant effect" have been made. (*Ibid.*)

As the agencies point out, Reabold's interpretation of the class 1 exemption would instead require a lead agency to consider potential environmental effects even where no unusual circumstances apply, thus rendering the key component of the unusual circumstances exemption superfluous. As we have

29

previously recognized, "[r]eading the phrase 'due to unusual circumstances' out of the [unusual circumstances exception] . . . would be contrary to the principle of construction that directs us to 'accord meaning to every word and phrase in a regulation.' " (*Id*. at p. 1098.)[7]

In addition, the agencies raise a practical concern with Reabold's view. They argue that the CEQA exemptions were intended to provide a streamlined process for identifying projects that typically will not have significant environmental effects, and Reabold's and the Court of Appeal's proposed rule is "at odds with that objective." The agencies explain that such a rule "would force public agency or private project proponents to submit evidence concerning potential case-specific environmental harms in an effort to justify application of the class 1 Exemption. And public agencies would, in turn, be required to review and consider that evidence in what would amount to a mini-CEQA environmental review — thus causing agencies to incur the kinds of costs and administrative burdens that the categorical exemptions were meant to curtail. In

---

[7] We have further concluded that "even if a proposed project faces no opposition, an agency invoking a categorical exemption may not simply ignore the unusual circumstances exception; it must 'consider the issue of significant effects . . . in determining whether the project is exempt from CEQA where there is some information or evidence in the record that the project might have a significant environmental effect.' " (*Berkeley Hillside*, *supra*, 60 Cal.4th at p. 1103.) But application of these principles does not advance Reabold's position here. The fact that a preliminary environmental determination may operate to take a project *outside* the scope of an otherwise applicable exemption does not mean this preliminary environmental review supplants or governs the threshold determination of whether a categorical exemption applies.

CNRA's experience overseeing implementation of the CEQA Guidelines, the added costs and complexity of adopting the Court of Appeal's approach could be substantial." These points are well taken. While some categorical exemptions may call for a preliminary assessment of environmental effects, lead agencies are not generally called upon to engage in such an in-depth environmental review at the exemption determination stage. We decline to impose such a burden here.[8]

### D. Project Conditions Relating to Environmental Effects

In addition to the statutory interpretation question addressed above, Sunflower raises the issue of whether a lead agency may impose project conditions relating to environmental effects while simultaneously declaring a project to be exempt from CEQA. In essence, Sunflower argues that certain project

---

[8]  Reabold raises additional arguments that generally relate to whether substantial evidence supports CalGEM's exemption determination, which as noted above, is beyond the scope of our review. Reabold, supported by the agencies, also reasserts its argument made below that this project is covered by CalGEM's class 1 equivalent exemption. That exemption extends to minor alterations of existing structures or facilities "involving negligible or no expansion of use . . . includ[ing], but . . . not limited to:  remedial, maintenance, *conversion*, and abandonment work on oil, gas, injection, and geothermal wells." (Cal. Code Regs., tit. 14, § 1684.1, italics added; see also Guidelines, § 15300.4 [authorizing state agencies to develop their own industry-specific CEQA exemptions, consistent with the CEQA statutes and Guidelines].) Sunflower counters that CalGEM's own regulatory guidance contradicts the regulation's application to the type of well conversion proposed here. We decline to consider the applicability of the CalGEM-specific exemption, which is not properly before us. However, the Court of Appeal may consider its relevance on remand.

conditions imposed by CalGEM on the proposed well conversion here were in fact veiled mitigation measures, which were improperly considered at the exemption determination stage of the project. (See *Azusa, supra,* 52 Cal.App.4th at p. 1199; *Salmon Protection & Watershed Network v. County of Marin* (2004) 125 Cal.App.4th 1098, 1108.) Reabold, supported by the agencies, counters that lead agencies may impose project conditions related to the environment on exempt projects without running afoul of CEQA. (See, e.g., *Protect Telegraph Hill v. City and County of San Francisco* (2017) 16 Cal.App.5th 261, 267; *San Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1019–1020; *Walters v. City of Redondo Beach* (2016) 1 Cal.App.5th 809, 815, 824.)

Although the parties have briefed this additional issue, we decline to address it. (Cal. Rules of Court, rule 8.516(b)(3).) If the Court of Appeal on remand were to decide that the evidence did not support CalGEM's class 1 exemption determination, that would obviate any discussion of this second issue. Whether a project condition is permissible or a veiled mitigation measure improperly imposed to qualify a project for an exemption also may require a fact-specific, record-based analysis. We decline to engage in such an analysis in the first instance, especially when it might ultimately become unnecessary depending on the Court of Appeal's disposition on remand.

## III. DISPOSITION

We hold that the class 1 exemption requires a determination of whether a project involves a negligible expansion or change in an existing or former use of the structure or facility in question. Because the Court of Appeal relied on an incorrect understanding of the class 1 exemption in determining

whether substantial evidence supported CalGEM's determination that the proposed well conversion was exempt, we reverse the judgment and remand this matter to the Court of Appeal for further proceedings consistent with our opinion.

**GUERRERO, C. J.**

**We Concur:**

**CORRIGAN, J.**
**LIU, J.**
**GROBAN, J.**
**EVANS, J.**
**CHAVEZ, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Concurring Opinion by Justice Kruger

The majority today holds that the words "negligible or no expansion of existing or former use" mean "negligible or no expansion of existing or former use." I agree, of course. Who wouldn't?

I write separately, however, to acknowledge that the dilemma the Court of Appeal in this case faced was somewhat more complex. The question the court sought to address was not whether the words of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.; hereafter CEQA) class 1 exemption mean what they obviously say. Rather, the question was — and remains — how, exactly, a lead agency or a reviewing court is supposed to decide whether a proposed expansion of use is "negligible" or not. (Cal. Code Regs., tit. 14, § 15301; hereafter Guidelines.)

"Negligible" is a relative term, as the Court of Appeal recognized; what is "negligible" for one purpose may well be substantial for another. So, like all such inquiries, the question whether an expansion of use is "negligible" demands some frame of reference. Here, to find that frame, the Court of Appeal looked to statutory purpose. Given CEQA's overarching aim of protecting the environment, the Court of Appeal reasoned, "it makes sense that the term negligible is intended to allow changes or expansions in use that are inconsequential and to

exclude changes in use that threaten environmental harm. In other words, when a modified project is put to a new use, the change in use is unimportant, as far as CEQA goes, if the risk of environmental harm from the new use is negligible." (*Sunflower Alliance v. Department of Conservation* (2024) 105 Cal.App.5th 771, 784.) The court went on to conclude that the expansion of use at issue here — the conversion of a shuttered oil extraction well into a well for injecting treated wastewater into an underground aquifer — constituted a negligible expansion of use because the "environmental risks of the conversion are negligible." (*Id.* at p. 787.)

I agree with the majority that the Court of Appeal erred in its analysis of the issue. But as I see it, the court's error was not in looking for a yardstick for measuring a "negligible" expansion of use. Nor, importantly, did the court err in turning to CEQA's environmental-protection purposes for guidance, or in concluding that considerations of environmental harm are relevant. As the parties and amici curiae California Natural Resources Agency (CNRA) and California Geologic and Energy Management Division (CalGEM) all acknowledged at oral argument, these considerations do have a role to play in applying the Class 1 exemption — if not quite as open-ended and expansive a role as the court envisioned.

As the majority explains, the error in the Court of Appeal's approach was identifying "negligible" expansions *entirely* by whether, in the court's judgment, the expansion poses a more-than-negligible risk of environmental harm. But the point of the class 1 exemption is not to enable courts (or, for that matter, lead agencies) to skip the next step of the CEQA process — i.e., formal study of potential environmental effects in accordance with statutory requirements — *in every case* involving the use

of an existing facility. (See maj. opn., *ante*, pp. 23–24.) The point of the exemption is instead to identify that limited set of projects, all involving the use of already-existing facilities, that are sufficiently unlikely to raise new kinds or degrees of environmental concerns that agencies and courts can confidently conclude that further, formal study of environmental effects is unnecessary.

The examples listed in the Guidelines — for instance, adding a bicycle lane to an existing street, or converting a single-family residence to office use (Guidelines, § 15301, subds. (c), (n)) — provide a useful benchmark for the nature and scope of expansions that fall into this category. Each involves what might be described as a "new" use of an existing facility, but neither is likely to give rise to a new kind or degree of environmental concern that warrants further, formal study.

If a proposed project or class of projects resembles or can reasonably be analogized to one of these or other section 15301 examples, then the exemption applies and the inquiry ends. This is because when a proposed project resembles a project the Secretary of CNRA has already determined to involve "negligible or no expansion of use," then it is reasonable to conclude that the proposed project also involves "negligible or no expansion of use." (Guidelines, § 15301.) Where there is no obvious resemblance, as in this case, the examples can still serve as a guide to the nature and scope of change in environmental risk that renders further formal study unnecessary under the class 1 exemption.

Ultimately, to determine whether the expansion at issue here is "negligible," the primary task for the Court of Appeal on remand will be to measure the expansion — *i.e.*, converting a

long-dormant oil extraction well into a well dedicated to daily injecting some 12,600 gallons of treated wastewater into an underground aquifer — not only by referring to CEQA's ultimate purpose of protecting the environment, but also by giving careful consideration to the manner in which CEQA demands that environmental concerns be aired and assessed.

As the majority notes, there also remains the question whether the agency with technical expertise in this area, CalGEM, has permissibly determined that well conversions of this type, in general, are unlikely to have significant environmental effects. (See Cal. Code Regs., tit. 14, § 1684.1; *id.*, § 15300.4 [authorizing agencies to develop industry-specific CEQA exemptions]; see generally maj. opn., *ante*, at p. 31, fn. 8.) The Court of Appeal did not consider this question in the decision on review, and it is a question for the court to evaluate in the first instance.

**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Sunflower Alliance v. Department of Conservation

---

**Procedural Posture** (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)** XX 105 Cal.App.5th 771
**Review Granted (unpublished)**
**Rehearing Granted**

---

**Opinion No.** S287414
**Date Filed:** June 25, 2026

---

**Court:**  Superior
**County:**  Contra Costa
**Judge:**  Edward G. Weil

---

**Counsel:**

Paul Hastings, Navi Singh Dhillon, Christopher J. Carr, Dylan J. Crosby and Grayson A. Peters for Real Party in Interest and Appellant.

Alston & Bird, Jeffrey D. Dintzer, Jeffrey P. Carlin, Ytran L. Hoang; Pillsbury Winthrop Shaw Pittman, Blaine I. Green, Margaret Rosegay and Eric T. Moorman for Western States Petroleum Association as Amicus Curiae on behalf of Real Party in Interest and Appellant.

Aqua Terra Aeris Law Group, Jason R. Flanders, Theresa M. Trillo; Brandt-Hawley Law Group, Susan Brandt-Hawley; Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Deborah A. Sivas, Matthew J. Sanders and Amanda D. Zerbe for Plaintiff and Respondent.

Environmental Law Clinic, Mills Legal Clinic at Stanford Law School, Deborah A. Sivas, Amanda Zerbe, Luke Norquist, Kevin K. Wang; Hollin Kretzmann, Talia Nimmer; and Tyler Earl for Center for Biological Diversity and Communities for a Better Environment as Amici Curiae on behalf of Plaintiff and Respondent.

Michael W. Graf for Douglas Bleakly as Amicus Curiae on behalf of Plaintiff and Respondent.

Miliband Water Law and Wesley A. Miliband for Diablo Water District as Amicus Curiae on behalf of Plaintiff and Respondent.

Rachel Mansfield-Howlett for the Planning and Conservation League, Preservation Action League of Los Altos, Save Our Heritage Organisation and West Adams Heritage Association as Amici Curiae on behalf of Plaintiff and Respondent.

Rob Bonta, Attorney General, Helen H. Hong, Acting State Solicitor General, Daniel A. Olivas, Assistant Attorney General, Samuel T. Harbourt, Aaron D. Pennekamp and L. Nichole Allan, Deputy State Solicitors General, Leena M. Sheet and Jackie K. Vu, Deputy Attorneys General, for the Natural Resources Agency and the Geologic Energy Management Division as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Navi Singh Dhillon
Paul Hastings LLP
101 California Street, 48th Floor
San Francisco, CA 94111
(415) 856-7000

Amanda D. Zerbe
Environmental Law Clinic
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, CA 94305
(650) 498-0027

L. Nichole Allan
Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102
(415) 510-3575